---

## THE MARS.

### (District Court, E. D. New York. April 15, 1899.)

COLLISION—TUG AND BARGE IN TOW—FOLLOWING VESSEL.

> A tug which was following another tug with two barges in tow on a parallel course, and about abreast of the tows, slowed and sheered to the starboard, and, in attempting to pass under the stern of the last barge to a position on the other side, came into collision with the barge and injured her. *Held*, that the tug, being the burdened vessel, under duty to keep out of the way, was presumptively in fault: and a claim that the barge, which carried some sail, sheered suddenly from her course, causing the collision, must be well supported by evidence to exonerate the tug.

This was a libel in rem against the steam tug Mars to recover damages for collision.

Owen & Sturges and Edward L. Owen, for claimants.

Peter S. Carter, for libelants.

THOMAS, District Judge. On the afternoon of the 7th day of January, 1898, the tug Luckenbach, conducting two barges by intervening hawsers of about 200 fathoms, preceded out of Hampton Roads the tug Mars, with a similar tow. The weather was fair, the sea calm, the tide ebb, and the wind moderate. At about one o'clock p. m. the Mars' starboard bow, just aft the stem, collided with the port quarter of the Smith, the second barge in the other tow, and the latter vessel seeks compensation for the resulting injury.

For a little time preceding the collision the Mars had been holding a course about parallel to that of the other tow, and about 200 feet or more from the same. The libelants charge that the Mars went too quickly to starboard for the purpose of going under the stern of the Smith, while the Mars charges that the barge, which was carrying sails, took a sudden sheer to port, and ran across the Mars' bow. So here are mutual accusations of a sudden alteration of course, and on each side any attempted narration of events conduces with usual nicety to the justification of the tow with which the witnesses were connected.

Certain salient features appear. The tows were shaped to go outside the Cape Charles light, which at the time of the accident was some nine miles distant. To accomplish this, the tows had been headed about E. N. E., but a corrected course to N. E. was adopted by the Luckenbach shortly before the accident, and to this course the Mars at first accommodated herself, by holding a little more to the westward. Although there were several miles of available water on her port side, the altered course of the Luckenbach led the Mars to anticipate that she might later come to shallow water, and she slowed

down so as to go on the starboard side of the other tow, as the latter should pull by, in which position she had been an hour or so before, and where the ocean was uninterruptedly at her disposal. After slowing, the Mars found that she was in danger of coming in contact with the Smith, because, as she alleges, the Smith was sheering to port; but, in any case, the Mars stopped and reversed, and undertook to go backward, but was not in time to avert the accident. Certain witnesses state that they saw the Smith sheer; that her heading at some time before or after the accident, or both, with reference to the rest of her tow, or the land, showed that she had sheered; while other witnesses testify, with equal solemnity, that the barge followed her tow with no greater deviation than is usual in the course of good navigation on a quiet sea, with a moderate wind, but that the Mars turned sufficiently to starboard to cause the contact.

A careful study of the evidence leaves the court in doubt of the relative veracity or accuracy of the witnesses. Hence the use of other resources must determine in what direction the probabilities point. In the first place, the avowed purpose of the Mars in slowing was to allow the other tow to proceed, so that the Mars might be put in a position of greater sea room, after having taken up her position on the starboard side of the Luckenbach's tow. The execution of that purpose would take the Mars to starboard. In fact, she struck the barge on her port quarter, and scarcely failed of going under her stern, which would indicate a course on her part which accorded with the intention which her mate declares he had of going on the other side. On the other hand, there would be no intelligent reason for the barge going to port, confessedly out of the course of her tug and preceding barge. Hence, if she did so, it was an accidental sheer, and not an intended deflection. It is urged that no one was in her pilot house, but the evidence of her own crew on this point is preferred. It is undoubted that the barge, with limited means of self-propulsion, did not follow with precision her conductors; but that was expectable, and should have been an ever-present consideration in the mind of the mate, who was at the wheel of the Mars. But if the Mars had slowed up to allow the other tug to pass ahead, and if it was her intention to go, and she did all but go, under the Smith's stern, is it not reasonable to believe that her effort to do so, plus the ordinary and expectable sheering of the barge, was the cause of the collision? It seems a fit conclusion. And this view is strengthened by a consideration of the obligation resting upon the tug. She was the following vessel. It was her place to keep out of the way. She evidently attempted to pass on the port side, and, precluded from this, she was dropping out of one position for the purpose of taking another, and while doing this the collision occurred. It seems to burden her with the necessity of exculpation, and she attempts it by accusing the tug of an aberration in navigation, senseless and unaccountable, done without purpose, but so delicately timed as to relieve the tug of her responsibility. It is observed, in cases where a vessel is charged with a breach of the imposed duty of avoiding a privileged vessel, that a customary defense is that the preferred ship was proceeding with well-ordered behavior, which had every appearance of continuance,

but that she suddenly whirled from her right course, and did the very wrong which is charged against the other vessel. Of course, this is not impossible. But when a following tug, with the intention of dropping behind and going to starboard, collides with the port quarter of a preceding barge in tow, a charge that the barge suddenly whirled off her course, and struck the other vessel, while some 200 feet away, does not carry on its face distinguished badges of credibility, and should be well supported by evidence. It must be confessed that conclusions, to a considerable degree based on presumptions, burdens of proof, and inferences flowing from statutory obligations, are not wholly satisfactory. But courts are not responsible for the inaccuracies, mendacities, or contradictions of witnesses, and, in cases of confusion created thereby, there must be called to the solution of controverted facts the artificial aids which have been regarded as valuable and efficient for the solution of obscure inquiries, and such aids have been adopted accordingly. The decree should be for the libelants, with costs.